**INDEPENDENT UNION OF FLIGHT ATTENDANTS, Plaintiff-Appellant,**

v.

**PAN AMERICAN WORLD AIRWAYS, INC., Defendant-Appellee.**

No. 929, Docket 85–9052.

United States Court of Appeals, Second Circuit.

Argued March 17, 1986.

Decided April 25, 1986.

Ira Drogin, New York City, (Leaf, Sternklar & Drogin, of counsel, for plaintiff-appellant.

Thomas E. Reinert, Jr., New York City (Harry Rissetto, Robert D. Manfred, Jr., Morgan, Lewis & Bockius, Washington, D.C., Ernest L. Garb, Richard Schoolman, Pan American World Airways, Inc., New York City, of counsel), for defendant-appellee.

Before PIERCE, MINER and ALTIMARI, Circuit Judges.

PER CURIAM:

This is an appeal from that part of the opinion and judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, J.) in *Independent Union of Flight Attendants v. Pan American World Airways, Inc.,* 85 Civ. 7702, 620 F.Supp. 447 (S.D.N.Y.1985) ("Op.") that holds that the district court lacked subject matter jurisdiction over a "minor" dispute involving the suspension of one Star Hesse, a flight attendant and union representative, in response to her allegedly having made false statements to the Federal Aviation Administration ("FAA") while reporting alleged violations by Pan American World Airways, Inc. ("Pan Am") of its collective bargaining agreement. We affirm that holding but express no view as to other parts of the district court's opinion and judgment, which appellant has not raised, granting in part and denying in part the Independent

Union of Flight Attendants' (IUFA's) motion for a preliminary injunction.

IUFA is the certified representative of Pan Am flight attendants under the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.*, which governs labor relations in the air transport industry, *id.* at §§ 181–88. IUFA and Pan Am renewed and revised their collective bargaining agreement in March, 1985. An ongoing dispute subsequently arose involving the right of flight attendants to "walk off" duty when certain delays or diversions caused their projected or elapsed on-duty time to exceed the attendants' duty day hour limitations. The company circulated a July 3 memorandum stating that the "walk off" provision applies only when attendants report for duty, not when delays occur during duty already in progress. On August 1, attendants aboard Flight 55 from London to Chicago threatened to walk off duty when a flight delay in Detroit would require them to work longer than their alleged fifteen-hour duty day limit under the agreement. The FAA does not regulate the number of hours that attendants may work.

During the dispute, Hesse was working in the IUFA office in New York. She received a telephone call from an attendant on Flight 55 regarding the dispute. She called the FAA in Washington, but received only a taped message. She then called the FAA New York district office, reported the dispute and requested an immediate on-site inspection. The New York office referred her to the Ypsilanti office, the closest to Detroit; she passed this information to the Flight 55 crew in Detroit. The attendants ultimately decided to honor their "work now, grieve later" policy, and worked a total of approximately nineteen hours. The following day, Pan Am directed Hesse to report to the company regarding her complaint to the FAA. On September 3, Pan Am issued a letter suspending Hesse for thirty days for "making false or misleading statements ... about the Company" and for acting to "adversely affect[ ] the Company's services and/or reputation," all in connection with the Flight 55 affair. IUFA claims that Pan Am thus violated section 152 (third and fourth) of the Railway Labor Act.[1]

The Railway Labor Act, as amended, establishes different administrative dispute resolution mechanisms for "major disputes," which include attempts to change "rates of pay, rules, or working conditions not adjusted by the parties in conference," 45 U.S.C. § 155 (first) (a); "minor disputes," which involve grievances over the "meaning or proper application of a particular provision" in an existing collective bargaining agreement, *see Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 & n. 16, 65 S.Ct. 1282, 1290 & n. 16, 89 L.Ed. 1886 (1945) (citing legislative history); 45 U.S.C.

---

1. Railway Labor Act Section 2 (third), 45 U.S.C. § 152 (third), provides:

*Designation of representatives.*

Representatives for the purposes of this Chapter shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

Railway Labor act Section 2 (fourth), 45 U.S.C. § 152 (fourth), provides:

*Organization and collective bargaining; freedom from interference by carrier; assistance in organizing or maintaining organization by* carrier forbidden; deduction of dues from wages forbidden.

Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Chapter. No carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor orga-

§ 153, and "representation disputes," which involve controversies over the designation of union representatives, 45 U.S.C. § 152 (ninth). *See also Air Line Pilots Association International v. Texas International Airlines, Inc.,* 656 F.2d 16, 20 n. 6 (2d Cir.1981).

While "major disputes" involve the formation of collective bargaining agreements or modifications thereof, "minor disputes" involve the application or interpretation of existing rights. *See Air Cargo Inc. v. Local Union 851, Int'l Bhd. of Teamsters,* 733 F.2d 241, 245 (2d Cir.1984). The labor-management adjustment boards, created pursuant to 45 U.S.C. § 184, have exclusive jurisdiction over "minor disputes," which include disciplinary disputes even if involving employee discharge. *Andrews v. Louisville & Nashville R. Co.,* 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95

(1972).[2] The adjustment boards *a fortiori* would seem to have exclusive jurisdiction where, as here, the underlying dispute involves merely a disciplinary suspension.

█ Running through Congress' exacting allocation of administrative jurisdiction is a "thread" of judicial intervention in cases in which, " 'but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands which Congress had written into the Railway Labor Act.' " *Air Line Pilots,* 656 F.2d at 21 (quoting *Switchmen's Union v. National Mediation Board,* 320 U.S. 297, 300, 64 S.Ct. 95, 97, 88 L.Ed. 61 (1943)). Where, as here, a post-certification dispute develops concerning existing rights, that dispute would appear to arise under section 153. In such a case, the statutorily-created adjustment board procedure

nization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assesments, or other contributions: *Provided,* That nothing in this Chapter shall be construed to prohibit a carrier from permitting an employee, individually, or local representatives of employees from conferring with management during working hours without loss of time, or to prohibit a carrier from furnishing free transportation to its employees while engaged in the business of a labor organization.

2. Railway Labor Act Section 204, 45 U.S.C. § 184, provides in pertinent part:

*System, Group, or Regional Boards of Adjustment*

The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on April 10, 1936 before the National Labor Relations Board, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board, as hereinafter provided, with a full statement of the facts and supporting data bearing upon the disputes.

It shall be the duty of every carrier and of its employees, acting through their representa-

tives, selected in accordance with the provisions of sections 181 to 188 of this title, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment, under the authority of section 153 of this title.

We reject IUFA's effort to avoid Railway Labor Act statutory and case law by urging that its rights be construed with reference to the broader judicially cognizable rights created by the Labor Management Relations Act. First, such construction contravenes the Supreme Court's express admonition regarding construction of the Railway Labor Act. *See Chicago & N.W.R. Co. v. United Transportation Union,* 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 1736 n. 11, 29 L.Ed.2d 187 (1971). Second, the general restriction of the scope of the Railway Labor Act to organizing and representational rights, as opposed to the broader "concerted activity" rights under the Wagner Act, is clearly supported by the legislative history. *See, e.g., An Act to Amend the Railway Labor Act to Cover Every Common Carrier by Air Engaged in Interstate or Foreign Commerce: Hearings on S. 2496 before a Subcommittee of the Senate Committee on Interstate Commerce,* 74th Cong., 1st Sess. 25 (1935). Finally, contrary to IUFA's contention, section 7 of the Wagner Act did not "originate[ ] in" but rather was drafted and proposed to the Senate prior to the enactment of section 152 of the Railway Labor Act. *See An Act to Amend the Railway Labor Act: Hearings on S. 3266 before the Senate Committee on Interstate Commerce,* H. Rept. No. 1944 73d Cong., 2d Sess. 12 (1934), *reprinted in* Legislative History of the Railway Labor Act 918, 929 (1974).

might nonetheless be considered ineffective, and federal judicial intervention thus warranted, only where it is clear that the employer's conduct has "been motivated by anti-union animus or . . . an attempt to interfere with its employees' choice of their collective bargaining representative," *Tello v. Soo Line R.R.*, 772 F.2d 458, 462 (8th Cir.1985), or constitutes "discrimination or coercion" against that representative, *International Brotherhood of Teamsters v. Pan American World Airways*, 607 F.Supp. 609, 614 n. 5 (E.D.N.Y.1985) or involves "acts of intimidation [which] cannot be remedied by administrative means," *Local Union 808 v. P & W Railroad Co.*, 576 F.Supp. 693, 703 (D.Conn.1983). In all of the above cases, federal court intervention was found unwarranted.

■ IUFA contends that judicial intervention in this post-certification dispute is warranted because, in its view, the suspension of Hesse was motivated by an alleged objective on Pan Am's part to destroy the effectiveness of IUFA's representation. IUFA relies principally on *Brotherhood of Railroad Trainmen v. Central of Georgia Ry. Co.*, 305 F.2d 605 (5th Cir.1962). In so relying, IUFA reads *Georgia* too broadly.[3] There, management did not contradict the union's allegation upon motion to dismiss that the employer had an overall scheme to destroy the effectiveness of the union representative. In contrast, the present action has progressed beyond the motion to dismiss stage. IUFA thus may not rely on bare allegations of anti-union animus, *see International Association of Machinists*

*and Aerospace Workers v. Northwest Airlines*, 673 F.2d 700, 712 (3d Cir.1982), which in any event Pan Am contests. IUFA has not demonstrated that, having reviewed the evidence regarding Pan Am's alleged objectives,[4] the district court erred in finding that IUFA "failed to prove that this suspension was a predetermined effort to 'frustrate and undermine the effectiveness of such bargaining agent by securing his discharge for unfounded, false, or baseless charges.'" Op. at 143 (quoting *Georgia*, 305 F.2d at 608).

IUFA failed to sustain its burden of proof as movant on this critical allegation. Its argument rests principally on the Flight 55 incident and the testimony of Brian Moreau, an IUFA officer, that Pan Am supervisors had warned him that "[i]f I deal with the FAA as a union representative . . . they would take appropriate action." The Flight 55 incident constitutes precisely that kind of "minor" dispute over existing rights that Congress intended to be adjudicated before an adjustment board. As to the Moreau testimony, we cannot say that the district court erred in apparently holding such testimony, viewed in light of the Flight 55 incident and the subsequent suspension of Star Hesse, insufficient to establish the requisite anti-union scheme. Further, there is no evidence that Pan Am has precluded Star Hesse or any other flight attendant from challenging any disciplinary action through the adjustment board procedure. Under these circumstances, we will not hold clearly erroneous the district court's findings as to Pan Am's motive.

---

**3.** We are particularly reluctant to extend the rationale of *Georgia* where, as here, there is not a clear showing of an overall employer objective of undermining union representation. First, even the Fifth Circuit, which decided *Georgia*, has recognized the importance of reading that decision narrowly so as not to infringe upon Congress' conferral of jurisdiction on the adjustment boards. *See Georgia*, 305 F.2d at 608–09; *see also International Ass'n of Machinists v. Eastern Airlines*, 320 F.2d 451 (5th Cir.1963). Second, *Georgia* preceded the Supreme Court's decision in *Andrews*, which, as noted, has unequivocally construed the Railway Labor Act as conferring *exclusive* jurisdiction over "minor" disputes in the adjustment boards.

**4.** This cause came on to be heard on appeal from a judgment of the district court granting in part and denying in part IUFA's motion for preliminary injunction enjoining certain incentive and disciplinary practices of Pan Am that serve as the predicate for the issue on appeal herein. Since both parties have consented to treating this appeal from a motion for preliminary injunction as a consolidated appeal from preliminary *and* permanent relief pursuant to Fed.R.Civ.P. 65(a)(2), we assume that for purposes of this appeal, IUFA rests on the evidence of Pan Am's alleged anti-union animus as presented to the district court.

*Cf. McCann v. Coughlin,* 698 F.2d 112, 124 (2d Cir.1983) (noting "particular reluctance" to overturn district court findings as to motive or intent).

Thus, the district court did not err in concluding that the disciplining of Star Hesse arose from the same administratively cognizable contractual dispute as the disciplining or discharging of flight attendants who, in instances separate from the Flight 55 incident, abandoned duty on the basis of the union's interpretation of the "duty day" and "walk off" provisions. Indeed, in *Independent Union of Flight Attendants and Star Hesse v. Pan American World Airways, Inc.,* 84 Civ. 6485 slip op. at 9–10 (S.D.N.Y. Oct. 30, 1985) (*"Star Hesse"*), the court dismissed a complaint alleging that Pan Am had retaliated against Hesse for exercising her statutory right to organize and communicate with fellow members. IUFA seeks to distinguish the *Star Hesse* action principally on the ground that there, Hesse had a personal stake in the underlying dispute, involving employee pension benefits, whereas here, Hesse's conduct in contacting the FAA reflected solely her role as a union representative. But Hesse has a personal and a representational stake in duty day limitations just as she has in pension benefits. Nor does the fact of Hesse's having reported to the FAA Pan Am's alleged violation of its collective bargaining agreement during the Flight 55 incident render the resultant labor dispute justiciable in federal court. *See Pavolini v. Bard-Air Corp.,* 645 F.2d 144, 148 (2d Cir.1981) (employee's reporting alleged violations to FAA in interest of public and employee safety not cognizable in federal court).

Since we cannot say that the district court erred in finding that IUFA failed to demonstrate that Pan Am's conduct reflected the requisite improper objective, we affirm the district court's holding that it lacked subject matter jurisdiction over the dispute involving the suspension of Star Hesse.

Affirmed.